BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
LYNDSI ALLSOP (Cal. Bar No. 323485)
Assistant United States Attorney
Deputy Chief, Major Crimes Section
KENNETH R. CARBAJAL (Cal. Bar No. 338079)
Assistant United States Attorney
Major Crimes Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:     (213) 894-3165/3172
        Facsimile:     (213) 894-3713/0141
        E-mail:        lyndsi.allsop@usdoj.gov
                       kenneth.carbajal@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 25-434-JLS-1 |
|---|---|
| Plaintiff, | OPPOSITION TO DEFENDANT ARA ARTUNI'S FIRST APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION |
| v. | |
| ARA ARTUNI,<br>   aka "Ara Harutyunyan,"<br>   aka "Aro,"<br>   aka "Araboyi,"<br>   aka "Arabo,"<br>   aka "Santos," | Hearing Date: September 4, 2025<br>Hearing Time: 10:00 a.m.<br>Location:     Courtroom of the<br>              Hon. Patricia<br>              Donahue |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Lyndsi Allsop and Kenneth R. Carbajal, hereby files its Opposition to Defendant Ara Artuni's First Application for Review/Reconsideration of Order Setting Conditions of Release/Detention.  (Dkt. No. 156 ("App").)

This Opposition is based upon the attached memorandum of points and authorities, the Declaration of Lyndsi Allsop, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 3, 2025          Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division


                              _____/s/_____
                              LYNDSI ALLSOP
                              KENNETH R. CARBAJAL
                              Assistant United States Attorneys

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

**Contents**

TABLE OF AUTHORITIES.................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES.................................................1

I.    INTRODUCTION..................................................................1

II.   ARGUMENT.....................................................................3

      A.    Defendant's Placement in the SHU Comports with BOP
            Policy and Is Defendant's Only Viable Housing Option
            at MDC-LA...............................................................3

      B.    The BOP Has Provided Defendant with Legal and Social
            Calls and with Recreation and Law Library Time..........................5

      C.    Defendant Has Access to Legal Visitation 70 Hours Per
            Week....................................................................7

      D.    The BOP Has Sufficiently Addressed Defendant's Medical
            Concerns................................................................8

      E.    Defendant Has Not Submitted Any BP-8 or BP-9 Requests
            as Defense Counsel Alleges..............................................8

      F.    Defendant's Rights Do Not Appear to Have Been Violated....9

III.  CONCLUSION...................................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**CASES**

Anderson v. Cnty. of Kern,
    45 F.3d 1310 (9th Cir. 1995)...............................10, 11

Hewitt v. Helms,
    459 U.S. 460 (1983).........................................10

Hudson v. McMillian,
    503 U.S. 1 (1992)...........................................10

May v. Baldwin,
    109 F.3d 557 (9th Cir.).....................................11

Ramirez v. Galaza,
    334 F.3d 850 (9th Cir. 2003)................................11

Sandin v. Conner,
    515 U.S. 472 (1995).......................................10, 11

Serrano v. Francis,
    345 F.3d 1071 (9th Cir. 2003).............................10, 11

Shotwell v. Brandt,
    No. 10-cv-5232-CW, 2012 WL 6569402
    (N.D. Cal. Dec. 17, 2012)...................................10

Toussaint v. McCarthy,
    801 F.2d 1080 (9th Cir. 1986)...............................10

**STATUTES**

18 U.S.C. § 1962(d)..............................................1

18 U.S.C. § 371.................................................1

18 U.S.C. §§ 1959(a)(3), (a)(5).................................1

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

On or about June 3, 2025, a grand jury returned an indictment charging defendant ARA ARTUNI also known as ("aka") "Ara Harutyunyan," aka "Aro," aka "Araboyi," aka "Arabo," aka "Santos," ("defendant") with Racketeer Influenced and Corrupt Organizations Act ("RICO") Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1); Violent Crimes in Aid of Racketeering, in violation of 18 U.S.C. §§ 1959(a)(3), (a)(5) (Counts 2-4); and Conspiracy to Commit Theft from Interstate and Foreign Shipments, in violation of 18 U.S.C. § 371 (Count 6).  (Dkt. No. 54 ("Indictment").)

Prior to indictment, on or about May 20, 2025, defendant was arrested on a complaint as part of an operation targeting warring Armenian Organized Crime syndicates, one of which the government alleges is led by defendant.  (See 2:25-mj-02952-DUTY ("Compl.").) Then, following his arrest, and in the presence of law enforcement, defendant got into a physical altercation with his main rival, Armenian Organized Crime leader Robert Amiryan.[1]

The conduct underlying the offenses charged are serious. Defendant is alleged to have masterminded the attempted murder and assault of Amiryan and his wife.  (See Indictment, Counts 2-4.)  In addition, defendant is alleged to have been behind a murder as well as several other murder attempts and assaults targeting various members of Amiryan's organized crime group in addition to other members of the Armenian criminal community.  (See Indictment, Count

---

[1] Amiryan was separately charged in an indictment for offenses related to kidnapping.  United States v. Robert Amiryan, No. CR 25-433-SPG, Dkt. No. 49 (C.D. Cal. June 3, 2025).

1, Overt Acts 1-98.)  When targeting Amiryan and others, defendant has seemingly employed *Sureño* gang members to do his bidding.  (See generally Indictment.)

On or about May 28, 2025, this Court (J. Donahue) ordered defendant permanently detained pending trial after he submitted on detention.  (See Dkt. No. 39 ("Detention Hr'g").)  With respect to detention, the court found that the government had proved "[b]y clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community[.]"  (Dkt. No. 45 ("Detention Order").)  The court further found that the government had proved "[b]y a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required."  (Id.)

Since May 20, 2025, defendant has been housed at Metropolitan Detention Center – Los Angeles ("MDC-LA").  Defendant was placed in the facility's Special Housing Unit ("SHU") on or about the date he was first detained.

On or about August 22, 2025, defendant filed an application for review or reconsideration of order setting conditions of release or detention.  (Dkt. No. 156 ("App.").)  With respect to the conditions of his confinement, defendant raises concerns falling into seven categories, including: (i) Special Housing Unit Placement, (ii) Transfer Request, (iii) Legal and Social Calls, (iv) Recreation Time and Law Library Time, (v) Legal Visitation, (vi) Medical Concerns, and (vii) BP-8 and BP-9 Submissions and Responses.  (SeeuApp. at ¶¶ 4-6, 8-10, 14-20.)  As a form of relief, defendant asks the Court to order the Bureau of Prisons (the "BOP") to have him removed from the

2

SHU and placed in general population at either MDC-LA or another facility. (See id. ¶ 6.) Below, the government, having been provided information by the BOP, addresses defendant's allegations and arguments in turn.

**II. ARGUMENT[2]**

    **A. Defendant's Placement in the SHU Comports with BOP Policy and Is Defendant's Only Viable Housing Option at MDC-LA**

Defense counsel represents that defendant is being disparately treated without cause. (See App. ¶ 15.) This does not appear to be the case. Indeed, based on information provided by the BOP, defendant's SHU placement has been well-considered and is consistent with the BOP's policies and practices.

Per the BOP, it is necessary for defendant to remain in the SHU to ensure the safety of others as well as himself. (See Declaration of Lyndsi Allsop ("Allsop Decl.") ¶ 3.) The danger defendant poses to others is clearly outlined in the charges against him. As previously stated, defendant is charged with orchestrating a murder as well as other assorted murder attempts and assaults. (See Indictment, Counts 1-4, 6.) Several of his intended victims, including Amiryan, are presently housed at MDC-LA. (Allsop Decl. ¶ 3.) The proximity of defendant with the individuals he targeted while in the community has the potential for catastrophic consequences, that is, one of them being murdered while co-housed at MDC-LA. Defendant's dangerousness is not limited to the (very serious) allegations in the charging instrument. It is also evidenced by his post-arrest physical altercation with Amiryan, which

---

[2] BOP attorneys and the government reserve the right to provide additional argument and evidence at the hearing on September 4, 2025.

notably, his attorney does not dispute (see App. ¶ 3).  Ultimately, to avoid any further harm coming to defendant's intended victims, or to prevent any retaliatory acts targeting defendant, the BOP has determined that defendant must be kept in the SHU.  (See Allsop Decl. ¶ 3.)

Defendant's placement in the SHU is not arbitrary, rather it is consistent with the BOP's policy and procedures.  Defendant's physical altercation with Amiryan violated BOP Prohibited Act Code 201: Fighting with Another Person.  (See id.)  Given the seriousness of this incident, defendant's (alleged) history of targeting Amiryan and others, as well as other safety concerns that the government shared with the BOP,[3] the BOP categorized defendant's fight as a High Severity Level Prohibited Act; and these factors collectively supported defendant's placement in the SHU.[4]  (See id.)  Other BOP policies informing defendant's SHU placement are BOP Program Statement 5180.05 7 Central Inmate Monitoring System, (f) Separation[5]

---

[3] To be clear, the government has not requested that defendant be kept in the SHU, only that he be kept away from his intended victims and individuals who he may continue to conclude with to commit heinous acts.

[4] Defense counsel notes that Amiryan has since been removed from the SHU.  (App. ¶ 3.)  However, there are additional considerations that the BOP must consider other than this fight, like the fact that defendant has allegedly colluded with others to kill several individuals who are also presently detained at MDC-LA.

[5] BOP Program Statement 5180.05 7 Central Inmate Monitoring System, (f) Separation reads: "Inmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future.  Factors to consider in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual (in open court, to a grand jury, etc.), and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution.  This
*(footnote cont'd on next page)*

and BOP Program Statement 5180.05, Central Inmate Monitoring System, 7(d) Disruptive Group.[6]  Collectively, these two statements permit defendant's SHU placement based on his (alleged) murderous behavior in the community, the U.S. Attorney's Office's expressed safety concerns, and defendant's affiliation with Armenian Organized Crime and *Sureño* gangs overseen by the Mexican Mafia (or "*La Eme*").  On these facts and because of the limited amount of space available at MDC-LA, the SHU appears to be defendant's only available housing option.  Placing defendant in general population would otherwise elevate security risks.  (See id.)

Defense counsel requests that defendant be removed from the SHU. (See App. ¶ 6.)  As an alternative form of relief, defense counsel calls for defendant to be transferred to another facility (see id.); however, such action is beyond the realm of the BOP's authority. Defendant is an inmate under the jurisdiction of the United States Marshals Service (the "Marshals"), as such, all transfer inquiries related to his case are reviewed and processed exclusively by the Marshals.  (Allsop Decl. ¶ 4.)

**B.  The BOP Has Provided Defendant with Legal and Social Calls and with Recreation and Law Library Time**

Defense counsel also represents that defendant has been denied

---

assignment also includes those inmates who have provided authorities with information concerning the unauthorized or illegal activities of others.  This assignment may also include inmates from whom there is no identifiable threat, but who are to be separated from others at the request of the Federal Judiciary or U.S. Attorneys."

[6] BOP Program Statement 5180.05, Central Inmate Monitoring System, 7(d) Disruptive Group, reads: "Inmates who belong to or are closely affiliated with groups (e.g., prison gangs), which have a history of disrupting operations and security in either state or federal penal (which includes correctional and detention facilities) institutions.  This assignment also includes those persons who may require separation from a specific disruptive group."

5

certain "rights" and "privileges", such as unrestricted access to telephones, the law library, email, and social visits and calls (App. ¶ 15).  Based on information provided by the BOP, this representation requires context and to a certain extent, correction.

As an inmate in the SHU, defendant is entitled to unlimited legal calls and one social call every 30 days, in accordance with BOP policy.  (Allsop Decl. ¶ 5.)  BOP staff have reported to the government that defendant has received legal calls as requested, as well as his social calls.  (Id.)  By way of example, on August 13, 2025, defense counsel contacted the BOP's legal department stating that she "missed two calls from him (voicemail)." (Id.)  SHU logs indicate that the calls were made by SHU staff at defendant's request, and because defense counsel did not answer, defendant was able to leave a voicemail message.  (Id.)  When defense counsel reached out regarding the missed legal calls, the BOP's legal department scheduled the next legal call[7] and SHU staff facilitated the call on August 14, 2025.  (Id.)

Next, defense counsel represents that defendant "has no access to the law library despite repeated requests."  (App. ¶ 18.)  Per the BOP, this is demonstrably false.  Inmates house in the SHU can apply for law library time to review discovery materials.  (Allsop Decl. ¶ 6.)  Defendant has access to the library facilities; however, he has not submitted any requests for law library time.  (Id.)

---

[7] In addition to an inmate's direct request to SHU staff, attorneys may reach out to the legal department to schedule legal calls.  (Allsop Decl. ¶ 5.)  The legal department requires 24-hour notice of a request to schedule a legal call.  (Id.)  The BOP can handle urgent matters related to court deadlines, but the attorney must provide the court's order regarding an imminent court deadline. (Id.)  If an emergency arises without a court order, the BOP can nevertheless help facilitate.  (Id.)

6

Defense counsel also represents that defendant "has effectively been denied outdoor exercise[.]"  (App. ¶ 14.)  Per the BOP, this allegation is also disproven by BOP records.  Regarding recreation, defendant has been offered daily one-hour outdoor recreation time per BOP policy but has declined.  (Id.)

**C.    Defendant Has Access to Legal Visitation 70 Hours Per Week**

Defense counsel represents that she has been denied the opportunity to meet with defendant in the SHU.  (App. ¶ 5.)  Per the BOP, this statement, like some others, requires context and/or correction.  Per BOP policy, inmates can meet with counsel in the SHU legal room from 8:00 a.m. - 8:00 p.m. PST, Monday through Friday, and from 8:00 a.m. - 1:00 p.m. on Saturdays and Sundays.  (Allsop Decl. ¶ 7.)  Visitation operates on a first-come, first-served basis, with three legal rooms available in the SHU.  (Id.)  BOP staff does not restrict a legal visitor's time with an inmate to accommodate others. (Id.)  As such, defense counsel has 70 designated hours during the week during which she can meet with defendant.  Taking the BOP's first-come, first-served approach into account, if defense counsel arrives at 8:00 a.m. or earlier, she should almost certainly be able to meet with him on any given day.

Regular visiting hours aside, MDC-LA experiences occasional elevator issues, sometimes resulting in delays to visitors.  (Id.) As a federal institution, routine and emergency lockdowns also occur occasionally, potentially delaying or suspending legal visitation. (Id.)  These issues will, regrettably, impact visiting hours, sometimes without warning.  Although inconvenient for counsel (see App. ¶ 5), BOP's primary concern remains the safety and security of the institution, inmates, and the public (id.).

7

**D.    The BOP Has Sufficiently Addressed Defendant's Medical Concerns**

According to defense counsel, defendant was denied medical treatment until she intervened.  (See App. ¶ 17.)  However, per the BOP, based on its review of defendant's BOP Electronic Medical Records ("BEMR"), defendant is presently receiving adequate medical care at MDC-LA.  (Allsop Decl. ¶ 8.)  Defendant was administered a blood test on July 24, 2025, for a cholesterol (lipid panel) screening.  (Id.)  At that time, he was prescribed Lipitor 20mg, and following the blood test results, his dosage increased to 40mg. (Id.)  A follow-up appointment was held on August 7, 2025, during which defendant's doctor ordered a 12-lead EKG, which was then performed by the nursing staff.  (Id.)  On the same date, defendant was also given a bilateral knee sleeve support for chronic knee pain. (Id.) Defendant may request a medical cop-out form from the medical staff for any future sick call requests.  (Id.)

**E.    Defendant Has Not Submitted Any BP-8 or BP-9 Requests as Defense Counsel Alleges**

Defense counsel asserts that defendant submitted a BP-8 (informal resolution) and a BP-9 (formal written Administrative Remedy Request) regarding his SHU confinement.  (See App. ¶¶ 8-9.) Per the BOP, based on a review of its records, defendant has not submitted a single BP-8 informal resolution to BOP's unit team. (Allsop Decl. ¶ 9.)  To address this, after this application was filed, defendant was advised to approach his unit team staff during their weekly rounds to express his intention to submit the BP-8 Form. (See id.)

Regarding the BP-9 submission, BOP verified that defendant has

not submitted the necessary forms.  (Id.)  Although BOP received a letter from defense counsel labeled as "BP-9 Administrative Remedy Request," that letter does not comply with BOP Policy[8] and is instead considered a Request to Staff (also known as a "copout").  (Id.)

Per the BOP, it responded to this Request to Staff and provided defense counsel with a detailed explanation of defendant's placement in the SHU and the reasons for denying his entry into the general population.  (Id.)  The response explained defendant's access to necessary resources, including legal calls and the law library, and clarified any restrictions on his account to ensure transparency.  (Id.)  It further explained that defendant's presence in the general population is viewed as a threat to the institution's security and orderly operation.  (Id.)

**F.     Defendant's Eight Amendment Rights Do Not Appear to Have Been Violated**

Defense counsel asserts that defendant's placement in the SHU and his alleged treatment while he has been housed there violates his due process liberty interests and his Eight Amendment rights.  (App. ¶¶ 20, 21.)  Based on the information provided by BOP, neither claim is viable.

---

[8] BOP Program Statement 1300.018, Administrative Remedy Program provides guidance on initial filings, extensions, and form requirements, as well as instructions on acquiring the appropriate forms.  (Allsop Decl. ¶ 9.)  Defendant may utilize the administrative remedy process described in 28 C.F.R. Part 542 and BOP Program Statement 1330.13, to submit any grievances and receive a formal written agency response.  (Id.)  Although inmates may obtain assistance from outside resources in preparing their administrative remedy requests, outside parties may not submit an administrative remedy request or appeal on an inmate's behalf.  28 C.F.R. § 542.16(a).

"[R]outine discomfort," such as placement in administrative segregation or the SHU, "is part of the penalty that criminal offenders pay for their offenses against society, [and] only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  See Hudson v. McMillian, 503 U.S. 1, 9 (1992); Toussaint v. McCarthy, 801 F.2d 1080, 1092–93 (9th Cir. 1986) ("[A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.") (quoting Hewitt v. Helms, 459 U.S. 460, 468 (1983)), overruled on other grounds by Sandin v. Conner, 515 U.S. 472 (1995); Shotwell v. Brandt, No. 10-cv-5232-CW, 2012 WL 6569402, at *3 (N.D. Cal. Dec. 17, 2012) ("[T]he usual hardships associated with administrative segregation do not violate the Eighth Amendment.") (citing Toussaint, 722 F.2d at 1494 n.6). Defendant has not raised such allegations here.  Indeed, "administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence."  Anderson v. Cnty. of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) (as amended) (citing Toussaint, 801 F.2d at 1091–92, abrogated in part on other grounds by Sandin, 515 U.S. at 483-84).

Defendant's allegations do not plausibly suggest that defendant was deprived of a constitutionally protected liberty interest. "[T]he due process clause does not of its own force create a liberty interest in freedom from administrative segregation." See Toussaint v. McCarthy, 801 F.2d at 1091-92 (citing Hewitt, 459 U.S. at 468); see also Serrano v. Francis, 345 F.3d 1071, 1078 (9th Cir. 2003),

10

cert. denied, 543 U.S. 825 (2004) ("Typically, administrative segregation in and of itself does not implicate a protected liberty interest.") (citations omitted); Anderson, 45 F.3d at 1315 (finding no liberty interest in freedom from administrative segregation; "there is no liberty interest in remaining in the general population"). Rather, a cognizable liberty interest is implicated only when administrative segregation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." See Serrano, 345 F.3d at 1078 (quoting Sandin, 515 U.S. at 484). "If the hardship is sufficiently significant, then the court must determine whether the procedures used to deprive that liberty satisfied Due Process." Ramirez v. Galaza, 334 F.3d 850, 860-61 (9th Cir. 2003), cert. denied, 541 U.S. 1063 (2004) (citations omitted).

Defendant alleges no facts plausibly showing that his confinement in administrative segregation amounted to an atypical and significant hardship sufficient to create a liberty interest. See May v. Baldwin, 109 F.3d 557, 565 (9th Cir.), cert. denied, 522 U.S. 921 (1997) ("the Ninth Circuit explicitly has found that administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence"). And, even if defendant had alleged facts plausibly showing he had a liberty interest at stake, he has not alleged that he was deprived of a constitutionally adequate process to challenge his continued detention in administrative segregation. Indeed, he as BP-8 and BP-9 forms available for him to fill out though, to date, he has not yet done so.

11

**III.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's request to be removed from the SHU.

**<u>DECLARATION OF LYNDSI ALLSOP</u>**

I, Lyndsi Allsop, declare as follows:

1.    I am an Assistant United States Attorney in the Central District of California, and I have been assigned to prosecute <u>United States v. Artuni, et al.</u>, No. CR 25-434-JLS.

2.    On or about August 27, 2025, Assistant United States Attorney Kenneth R. Carbajal and I received an email from Federal Bureau of Prisons (the "BOP") Supervisory Attorney May Shin detailing the BOP's efforts to address seven distinct categories that defendant raises in his motion, including: (i) Special Housing Unit Placement; (ii) Transfer Request; (iii) Legal and Social Calls; (iv) Recreation Time and Law Library Time; (v) Legal Visitation; (vi) Medical Concerns; and (vii) BP-8 and BP-9 Submissions and Responses.

3.    With respect to Special Housing Unit Placement, the BOP's email stated the following:

"According to Program Statement 5270.09, Mr. Ara Artuni's altercation with another inmate on May 20, 2025, falls under Program Statement 5270.09, Inmate Discipline Program. Mr. Artuni was found to have violated BOP Prohibited Act Code 201, Fighting with another person, which categorizes it as a High Severity Level Prohibited Act. Consequently, Mr. Artuni's placement in the Special Housing Unit (SHU) is warranted due to this incident and his complex case involving multiple co-defendants.

"In May 2025, at the request of the United States Attorney's Office, we received a list of inmates who require separation, with Mr. Artuni included among them.  Although some inmates have been relocated, others, including Mr. Artuni, remain housed at MDC[-]LA. The Bureau of Prisons (BOP) will continue to separate these inmates

to mitigate the significant security risks associated with their co-defendant status.

"According to our Program Statement 5180.05 7 Central Inmate Monitoring System, (f) Separation: 'Inmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future.  Factors to consider in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual (in open court, to a grand jury, etc.), and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution. This assignment also includes those inmates who have provided authorities with information concerning the unauthorized or illegal activities of others.  This assignment may also include inmates from whom there is no identifiable threat, but who are to be separated from others at the request of the Federal Judiciary or U.S. Attorneys.'

"Additionally, Program Statement 5180.05, Central Inmate Monitoring System, 7(d) Disruptive Group: 'Inmates who belong to or are closely affiliated with groups (e.g., prison gangs), which have a history of disrupting operations and security in either state or federal penal (which includes correctional and detention facilities) institutions. This assignment also includes those persons who may require separation from a specific disruptive group.'

"Given the limited housing units at MDC[-]LA, Mr. Artuni's placement in the general population would elevate the risk of collusion and security threats, as evidenced by the May 20, 2025,

2

fight.  Therefore, separating Mr. Artuni from his co-defendants is crucial to prevent coordinated actions or undue influence, ensuring the safety and security of BOP institutions."

4.   With respect to a Transfer Request, the BOP's email stated the following:

"Mr. Artuni is currently an inmate under the jurisdiction of the United States Marshals Service.  As such, all transfer inquiries related to his case are reviewed and processed exclusively by the United States Marshals Office.  It is important to note that MDC[-]LA does not hold any authority over the review or processing of transfer requests for inmates under Marshal custody."

5.   With respect to Legal and Social Calls, the BOP's email stated the following:

"While Mr. Artuni is entitled to unlimited legal calls, it is important to note that inmates housed in the Special Housing Unit (SHU) are limited to one social call every 30 days, in accordance with BOP policy.  Our SHU staff have confirmed that Mr. Artuni has received legal calls as requested, as well as his social calls that are given every 30 days.

"Attorney Mines first contacted and e-mailed the legal department on August 13, 2025, stating that she 'missed two calls from him (voicemail).'  SHU logs show that the calls were made by our SHU staff at the request of Mr. Artuni, and because Ms. Mines did not answer, Mr. Artuni was able to leave a voicemail message.  When Attorney Mines reached out regarding the missed legal calls, our legal department scheduled the next legal call and SHU staff facilitated the call on August 14, 2025.

3

"In addition to an inmate's direct request to SHU staff, attorneys may reach out to the legal department to schedule legal calls.  The legal department does require a 24-hour notice of a request to schedule a legal call, especially within the Special Housing Unit (SHU).  We can handle urgent matters related to court deadlines, but the attorney must provide the court's order regarding an imminent court deadline.  If an emergency arises without one, explaining the deadline will help us assist.

"Additionally, if a call is scheduled through the legal department and an attorney is unable to answer, or our staff is unable to facilitate the call due to unforeseen circumstances, a quick turnaround that same day may not always be feasible.  As previously mentioned, because Mr. Artuni is in SHU and not in general population, frequency limitations apply unless there is an imminent court deadline."

6.   With respect to Recreation Time and Law Library Time, the BOP's email stated the following:

"Inmates within SHU have the opportunity to apply for law library time to review both regular and sensitive discovery materials.  Mr. Artuni does have access to the library facilities; however, he has not yet submitted a request for law library time to either the SHU staff or the SHU lieutenant.  It is important that Mr. Artuni personally requests access to the law library by contacting the SHU staff directly.

"Regarding recreation, Mr. Artuni has been offered the daily one-hour outdoor recreation time per BOP policy but has declined. Our officers are prohibited from forcing inmates to participate in

4

recreational activities; they can only inform inmates of the available opportunities in hopes they will choose to engage."

7.    With respect to Legal Visitation, the BOP's email stated the following:

"Legal visitation with inmates housed in Special Housing Unit 'SHU' are conducted in the SHU legal room. MDC[-] LA legal visitation takes place from 8:00 AM - 8:00 PM PST, Monday through Friday, and from 8:00 AM - 1:00 PM on Saturdays and Sundays.  Visitation operates on a first-come, first-served basis, with three legal rooms available in the SHU.  We do not restrict a legal visitor's time with an inmate to accommodate others.

"Visitors may experience delays due to elevator issues, as SHU legal visits and other movements require elevator use.  As a federal institution, routine and emergency lockdowns are also possible, potentially delaying or suspending legal visitation.  Nevertheless, our primary concern remains the safety and security of the institution, inmates, and the public."

8.    With respect to Medical Concerns, the BOP's email stated the following:

"Mr. Artuni is receiving medical care at MDC as evidence in his Bureau of Prisons Electronic Medical Records ("BEMR").  Mr. Artuni was administered a blood test on July 24, 2025, for a cholesterol (lipid panel) screening, and the results indicated elevated levels. At that time, he was prescribed Lipitor 20mg, and following the blood test results, his dosage increased to 40mg.

"A follow-up appointment was held on August 7, 2025, during which Mr. Artuni's doctor ordered a 12-lead EKG, which has been scheduled and performed by the nursing staff. Additionally, on August

5

7, 2025, Mr. Artuni was given a bilateral knee sleeve support for chronic knee pain.

"Mr. Artuni is aware that he may request a medical cop-out form from the medical staff for any future sick call requests.  Once the form is completed, Mr. Artuni must submit it to the medical staff during their daily rounds for processing."

9.    With respect to BP-8 and BP-9 Submissions and Responses, the BOP's email stated the following:

Attorney Mines has mentioned that Mr. Artuni has submitted a BP-8 (informal resolution) and a BP-9 (formal written Administrative Remedy Request).  However, upon review, we have confirmed that Mr. Artuni has not submitted a BP-8 informal resolution to our unit team. To address this, Mr. Artuni has been advised to approach his unit team staff during their weekly rounds to express his intention to submit the BP-8 Form.

"Regarding the BP-9 submission, we have verified that Mr. Artuni has not submitted the necessary forms.  The letter received from Attorney Jasmine Mines labeled as 'BP-9 Administrative Remedy Request' does not comply with BOP Policy and is instead considered Request to Staff (also known as a copout).

"Mr. Artuni has received a response to this Request to Staff, which provides a detailed explanation of his placement in the Special Housing Unit (SHU) and the reasons for denying his entry into the general population.  The response details Mr. Artuni's access to necessary resources, including legal calls and the law library, and clarifies any restrictions on his account to ensure transparency.  It concludes by emphasizing that Mr. Artuni's presence in the general

6

population is viewed as a threat to the institution's security and orderly operation, justifying his continued placement in SHU.

"Program Statement 1300.018, Administrative Remedy Program, provides guidance on initial filings, extensions, and form requirements, as well as instructions on acquiring the appropriate forms. Please be advised that Mr. Artuni may utilize the administrative remedy process described in 28 C.F.R. Part 542 and BOP Program Statement 1330.13, to submit any grievances and receive a formal written agency response. Although inmates may obtain assistance from outside resources in preparing their administrative remedy requests, no one may submit an administrative remedy request or appeal on an inmate's behalf. 28 C.F.R. § 542.16(a)."

10. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on September 3, 2025.

_____
LYNDSI ALLSOP

7